[Cite as *State v. Stewart*, 2012-Ohio-3671.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25857 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RAYMOND STEWART | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 10 08 2323 |

DECISION AND JOURNAL ENTRY

Dated: August 15, 2012

CARR, Presiding Judge.

{¶1} Defendant-Appellant, Raymond Stewart, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Firefighters responded to a fire at Stewart's home on Augusta Lane shortly after 11:00 p.m. on March 30, 2009. After the fire department succeeded in extinguishing the fire, they investigated the home. Their investigation disclosed several items that raised suspicion, including the location and pattern of the fire. Further investigation uncovered that Stewart was suffering from financial difficulties and that more than one foreclosure complaint had been filed against him. The fire department contacted the state fire marshals so that a more stringent investigation could be conducted. Investigators later determined, as did Stewart's insurer, that the fire was intentionally set.

{¶3}    A grand jury indicted Stewart on the following counts: (1) two counts of aggravated arson, in violation of R.C. 2909.02(A)(1) and (A)(2), respectively; and (2) insurance fraud, in violation of R.C. 2913.47(B)(1).  A bench trial took place, at the conclusion of which the trial court found Stewart guilty on all three counts.  The court sentenced Stewart to a total of eight years in prison.

{¶4}    Stewart now appeals from his convictions and raises one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

APPELLANT'S CONVICTIONS FOR AGGRAVATED ARSON UNDER R.C. 2909.02(A)(1) AND (A)(2), AND INSURANCE FRAUD, R.C. 2913.47(B)(1), WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW, AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5}    In his sole assignment of error, Stewart argues that his aggravated arson and insurance fraud convictions are based on insufficient evidence and are against the manifest weight of the evidence.  We disagree.

{¶6}    A challenge to the sufficiency of the evidence questions whether the evidence at trial was sufficient as a matter of law to support the defendant's conviction.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "In determining whether the evidence is legally sufficient to support the jury verdict as a matter of law, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  "The test for sufficiency requires a determination of whether the

State has met its burden of production at trial." *State v. Edwards*, 9th Dist. No. 25679, 2012-Ohio-901, ¶ 7.

{¶7} R.C. 2909.02 defines the offense of aggravated arson. It provides:

No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Create a substantial risk of serious physical harm to any person other than the offender;

(2) Cause physical harm to any occupied structure * * *.

R.C. 2909.02(A)(1)-(2). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶8} R.C. 2913.47(B) defines the offense of insurance fraud. It provides:

No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall * * * [p]resent to, or cause to be presented to, an insurer any written or oral statement that is part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive * * *.

R.C. 2913.47(B)(1). A "statement" includes "any notice, letter, or memorandum; proof of loss; bill of lading; receipt for payment; invoice, account, or other financial statement; estimate of property damage; bill for services; * * * other evidence of loss, injury, or expense; computer-generated document; and data in any form." R.C. 2913.47(A)(5).

{¶9} Stewart argues that his convictions are based on insufficient evidence because the State failed to prove that he knowingly created or caused the fire that broke out in his home. According to Stewart, the State obtained his convictions by impermissibly stacking inference upon inference, as there was no evidence as to the actual cause of the fire. We disagree.

{¶10} Sergeant Daniel Rice and Detective Kenneth Wolf, two officers with the Sagamore Hills Police Department, testified that they arrived at Stewart's home several minutes after 11:00 p.m. and were the first officials to respond. Stewart was not present when the officers arrived, but both men saw Stewart arrive in his pick-up truck several minutes later. Sergeant Rice did not observe actual flames coming from Stewart's house at first, but saw heavy smoke billowing from an upstairs window and embers floating from Stewart's house to the house next door. Sergeant Rice immediately began evacuating Stewart's neighbors from their homes because he feared that the embers might cause the fire to spread to the surrounding houses. Once Sergeant Rice ensured the safety of Stewart's neighbors, he spoke with Stewart. Stewart told Sergeant Rice that he had just picked up his two children from their babysitter's home. Sergeant Rice observed the two children sitting in Stewart's truck.

{¶11} Several of Stewart's neighbors testified. Denise Bertolone, Robert Hudeck, Michele Prospal, and James Ostberg all testified that they had the opportunity to observe Stewart while the fire raged. Each neighbor testified that Stewart made several calls from his cell phone, but otherwise appeared very calm considering that his home was on fire. Bertolone spoke with Stewart and asked him how he thought the fire started. Stewart replied that the fire started in his bedroom closet. When Bertolone asked Stewart whether a fireman had told him that, Stewart responded: "No, I just know."

{¶12} Officer Chris Krettler testified that he contacted the American Red Cross at the scene. Red Cross volunteers quickly came to the scene to provide support and aid for Stewart and his family. Officer Krettler happened to be standing nearby one of the Red Cross volunteers while the volunteer was speaking with Stewart's eight-year old son. Officer Krettler heard Stewart's son tell the Red Cross worker that his family "had to leave because of the smoke."

Brenda Murphy, a Red Cross volunteer, later spoke with Stewart's children at the fire department. Stewart's six-year old daughter told Murphy that Stewart "had wrapped her in a blanket[,] carried her through the smoke, [and] put her in the car" before driving to the mall. When Murphy asked Stewart's daughter whether the situations she had just described had happened that night, Stewart's daughter responded affirmatively. After that, however, Stewart's daughter no longer wanted to talk about what had happened.

{¶13} Lieutenant Alexander Picone, a firefighter for Sagamore Hills, responded to Stewart's home on the night of the fire. Much like Sergeant Rice, Lieutenant Picone did not observe any flames when he arrived, but saw large amounts of smoke. Lieutenant Picone decided to take his firefighters into the house to make sure it was empty. The firefighters broke down the front door and proceeded to the second floor. On the second floor, Lieutenant Picone saw flames, but he and the rest of the firefighters were forced to retreat due to the intensity of the heat. Directly after the firefighters vacated the second floor, it collapsed. Lieutenant Picone specified that the area of the second-floor that collapsed was located directly above the area where the home's master bedroom and master bedroom closet met. He further specified that the majority of the area where the fire erupted was the master bedroom area. Lieutenant Picone testified that the fire was one of the hotter fires he had ever experienced and that it posed a substantial risk of death to his team. He opined that the fire could have been burning slowly for over an hour before the firefighters arrived, given that the house was closed up. The fire then rapidly accelerated, Lieutenant Picone explained, once the firefighters broke into the house and introduced more oxygen.

{¶14} Deputy Fire Chief Frank Risko also responded to the fire. Deputy Chief Risko testified that the fire department almost immediately identified the fire as suspicious in nature

due to its intensity and the fact that it appeared to be emanating from the middle of the home. Once the fire department succeeded in extinguishing the fire, the firefighters inspected the home to locate the fire's origin and, if possible, its cause. Deputy Risko stated that the fire originated in the master bedroom and master bedroom closet area, but the fire department was unable to locate the cause of the fire. Deputy Risko's inspection of the scene and conclusion that the fire was not accidental led him to contact the state fire marshals for further assistance.

{¶15} Brian Peterman, a state certified investigator with the Fire Marshal's Office, testified that he inspected Stewart's home after the fire along with his canine, Lacy. Peterman testified that Lacy is certified through the Bureau of Alcohol, Tobacco, and Firearms, to detect and alert to trace amounts of ignitable liquids at fire scenes. In his almost five years of handling Lacy, Peterman had never received a false positive indication from Lacy. Peterman brought Lacy into the master bedroom area of the house, as that area had the most extensive fire damage. In the master bedroom, Lacy alerted twice, indicating that she detected the presence of an ignitable liquid on two separate areas of the master bedroom floor. Peterman was not able to take Lacy into the closet of the master bedroom because the fire had completely consumed the floor of the closet.

{¶16} Apart from his inspection of Stewart's home with Lacy, Peterman also conducted a visual inspection. Peterman noted that there was no significant fire damage in the basement, up the stairway to the second floor, or in any of the second-floor bedrooms. Moreover, all of the gas lines in the home were intact and did not display any signs of leakage. Peterman was unable to identify any potential ignition source by sight, but noted an irregular burn pattern on the master bedroom floor. Peterman was able to see the burn pattern coming from the closet, into the bedroom, around the bed, and extending to the wall. Peterman testified that the pattern he

observed was consistent with the direct pouring of an ignitable liquid onto the floor. Further supporting his conclusion, Peterman noted that the fire in the master bedroom had burned through the floor. Peterman explained that fires typically travel upward and outward, but not down. A fire that burned down through a floor would be consistent with the use of an accelerant on the floor because an accelerant would keep the flames low to the ground. Peterman testified that he eliminated all accidental causes of the fire that he could and was unable to locate any ignition source within the home that would have accounted for the fire. Peterman testified that, in his expert opinion, the fire in Stewart's home was intentionally set and originated from the closet and floor in the master bedroom. Peterman based his conclusion on the burn patterns, the char patterns, and the heat intensity patterns he observed in the home as well as the travel of the fire that occurred within the structure.

{¶17} Both Gregory Woolley, a claims adjuster for Allstate, and Robert Chudakoff, an attorney retained by Allstate, spoke with Stewart in connection with his insurance claim. Woolley met with Stewart a few days after the fire to obtain a statement from him. Stewart told Woolley that he left his home around 7:00 p.m. on the night of the fire and, when he returned with his children between 9:00 p.m. and 9:30 p.m., the house was on fire. Stewart signed a sworn statement as well as a proof of loss with Allstate and accepted a $2,000 advance Allstate offered while it processed Stewart's claim. According to Woolley, Stewart denied that his home was in foreclosure. Stewart admitted that he was behind in his mortgage payments, but indicated that he had negotiated with the bank for a lower interest rate and had a plan to make his payments. Stewart also told Chudakoff that he never received any notice of foreclosure before the fire. Stewart admitted that he had lost his previous house in foreclosure and had fallen

behind in his mortgage payments before the fire, but insisted that he had renegotiated his payment plan so that the problem would have been solved.

{¶18} Much like he told Woolley, Stewart told Chudakoff that he left his home around 7:00 p.m. on the night of the fire. Stewart then went to the babysitter's home and stayed there until close to 9:00 p.m. when he returned home with his children. Stewart told Chudakoff that the police were there when he arrived home and advised him that his house was on fire. According to Stewart, the fire department took an additional thirty minutes to arrive.

{¶19} Detective David Piekarski also conducted an investigation of the fire at Stewart's home, beginning the day after the fire. Detective Piekarski testified that, when he inspected Stewart's home, he noticed several oddities. Specifically, he noted there was a lack of food or eating utensils in the kitchen and minimal clothing in one of the children's bedrooms. Although Detective Piekarski found a small propane torch in Stewart's basement, he testified that the gas valve on the torch was in the closed position and that it did not appear to have any fire damage.

{¶20} In conjunction with his investigation, Detective Piekarski subpoenaed all of Stewart's cell phone records. Detective Piekarski obtained, not only the details of the calls that Stewart made on the day and night of the fire, but also Stewart's location at the time he placed the calls. Detective Piekarski explained that every time a cellular phone user places or receives a call, the phone signal "pings" off of the closest cell phone tower to achieve a connection. The cellular provider then records the call based upon which cell phone tower the call pinged and the particular side of the triangular tower the call pinged. Each cellular tower has an alpha, beta, and gamma side assigned to it, such that, each call placed or received is logged according to tower number and alpha, beta, or gamma number. Based on the logged information, Detective Piekarski was able to determine approximately where Stewart was each time he made or received

a call. Detective Piekarski testified that his determinations were approximate because cell phone data only conveys the direction, but not the particular distance of a caller from any particular tower. Distance is only discernible to the extent that a call pings off of a different tower once the cell phone user travels far enough from the original tower.

{¶21} Detective Piekarski identified Stewart's home tower as "10021 Firestone" in Macedonia. Although Stewart did travel several times throughout the day and night of the fire, his cell phone number pinged off of his home tower at 2:08 p.m., 4:29 p.m., 8:42 p.m., 9:56 p.m., and 11:15 p.m. Several neighbors observed Stewart using his cell phone while the fire was burning. Detective Piekarski confirmed that all of the cell phone calls Stewart made or received at that time pinged off of the cell phone tower at 10021 Firestone.

{¶22} In addition to researching Stewart's cell phone records, Detective Piekarski also reviewed Stewart's financial information. Detective Piekarski uncovered two foreclosure complaints that had been filed against Stewart; one on November 1, 2007, and another on February 2, 2010. He testified that he also uncovered several loan modification agreements that Stewart entered into. The first payment on Stewart's latest loan modification agreement was due April 1, 2009, two days after the fire.

{¶23} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State presented sufficient evidence that Stewart intentionally set fire to his house and then provided Allstate with false information when he submitted his claim. There was testimony that the fire in Stewart's house began in the master bedroom closet and floor, both of which displayed an irregular burn pattern associated with the use of an accelerant. The fire also burned in a manner consistent with the use of an ignitable fluid, as it remained close to the ground long enough to burn through the floor, rather than travel upward and outward in a

pattern consistent with general fire behavior. Moreover, a certified canine detected the presence of trace amounts of ignitable fluid on two spots of the bedroom floor. A certified fire investigator also testified that, based on his experience and training, the fire was intentionally set. Stewart's cell phone records showed that he was in the area of his home at the approximate time the fire would have started, and both his children were heard commenting that they had to leave their home because of smoke. Further, the State produced evidence that Stewart was suffering from financial difficulties, having previously lost a home to foreclosure and having again fallen behind in his mortgage payments. Based on all the evidence presented, a rational trier of fact could have concluded that the State presented sufficient evidence of aggravated arson.

{¶24} A rational trier of fact also could have concluded that the State presented sufficient evidence of insurance fraud. Stewart completed both a sworn statement and a proof of loss form for Allstate. In his sworn statement, Stewart averred that the cause of the fire was unknown. He also accepted a $2,000 advance from Allstate while they investigated his claim. Stewart's argument that his aggravated arson and insurance fraud convictions are based on insufficient evidence lacks merit.

{¶25} Next, Stewart argues that his convictions are against the manifest weight of the evidence. When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (1986). This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant

and against conviction. *Thompkins*, 78 Ohio St.3d at 387. In our analysis, we are mindful that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus.

{¶26} Stewart does not present any separate argument in support of his manifest weight analysis other than to aver once again that his convictions are based upon multiple inferences. The record, however, does not support Stewart's argument that the State needed to rely on multiple inferences. Fire investigators certainly became suspicious of the fire in Stewart's home due to their inability to determine its cause, but that was not the only evidence in support of Stewart's convictions. As discussed above, the State also produced evidence that there was an irregular burn pattern in Stewart's master bedroom and closet, consistent with the use of an accelerant. A certified canine also detected the use of an ignitable fluid in the room, and Stewart's statements as to his whereabouts on the night of the fire were inconsistent with his location as deduced from his cell phone records. Moreover, before the firefighters even controlled the fire, Stewart told one of his neighbors that the fire had started in his bedroom closet. His children also made statements consistent with the conclusion that Stewart lit the fire and then took the children from the home. Based on our review of the record, this is not the exceptional case where the trier of fact lost its way and the evidence weighs heavily against Stewart's convictions. *See Otten* at 340. Stewart's sole assignment of error is overruled.

III.

{¶27} Stewart's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

DICKINSON, J.
BELFANCE, J.
CONCUR.

APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.