[Cite as *State v. McCoy*, 2017-Ohio-4163.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28103 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ANGELO S. MCCOY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014 11 3501 (Z) |

DECISION AND JOURNAL ENTRY

Dated: June 7, 2017

HENSAL, Presiding Judge.

{¶1}   Defendant-Appellant, Angelo McCoy, appeals from his conviction in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   On the evening of November 15, 2014, multiple law enforcement agencies conducted a raid at a home in Akron.  The raid occurred because the police suspected that a large scale, illegal dogfight was set to occur on the property.  As a result of the raid, the police arrested more than 45 individuals in connection with dogfighting.  Mr. McCoy was one of the individuals whom the police arrested.  At the time of his arrest, he had $436 in cash on his person.

{¶3}   A grand jury indicted Mr. McCoy on one count of dogfighting, in violation of Revised Code Section 959.16(A)(5), as well as a criminal forfeiture specification for the $436 in cash.  Mr. McCoy ultimately went to trial along with another of his co-defendants.  The jury

found him guilty of dogfighting, but the court dismissed the forfeiture specification linked to that count. The court sentenced him to serve 180 days in jail and one year of community control.

{¶4} Mr. McCoy now appeals from his conviction and raises four assignments of error for our review. For ease of analysis, we rearrange and consolidate several of the assignments of error.

II.

ASSIGNMENT OF ERROR II

MR. MCCOY'S CONVICTION FOR DOGFIGHTING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT OVERRULED MR. MCCOY'S CRIM. R. 29(A) MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR DOGFIGHTING.

{¶5} In his second and third assignments of error, Mr. McCoy argues that his dogfighting conviction is based on insufficient evidence and is against the manifest weight of the evidence. Because Mr. McCoy has addressed the two arguments together in his brief, we likewise consolidate them for purposes of our discussion. For the reasons that follow, we reject Mr. McCoy's arguments.

{¶6} Under Criminal Rule 29(A), a defendant is entitled to a judgment of acquittal on a charge against him "if the evidence is insufficient to sustain a conviction * * *." Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶7}** If, on the other hand, a defendant asserts that a conviction is against the manifest weight of the evidence,

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *Thompkins* at 387. An appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

**{¶8}** Revised Code Section 959.16(A)(5) provides that "[n]o person shall knowingly * * * [p]ay money or give anything else of value in exchange for admission to or be present at a dogfight." This Court recently examined the foregoing statute and found it to be ambiguous. *See State v. Taylor*, 9th Dist. Summit No. 28091, 2016-Ohio-7953. We, therefore, conducted a statutory analysis and determined that Section 959.16(A)(5)'s legislative history supports a disjunctive reading of the statute. *Id.* at ¶ 12-15. We held that, to support a conviction under Section 959.16(A)(5), the State may prove either that a person (1) knowingly paid money or gave something of value for admission to a dogfight, or (2) knowingly was present at a dogfight. *Id.* at ¶ 15. Under former Revised Code Section 2901.22(B), "[a] person acts knowingly,

regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶9} Captain Clark Westfall testified that he helped organize a raid at a home in Akron, where the police suspected that the owner was conducting a dogfighting operation. As part of its case-in-chief, the State introduced several pictures of the target residence, two of which are aerial map views. The pictures show that the home is located at the end of a dead-end street and has a sizeable backyard that abuts a noise barrier for the freeway. The backyard contains a detached garage as well as a freestanding trailer. The front of the home faces west, and the entire backyard is enclosed by a fence. The fence joins to the house on the house's north and south sides such that the fence traverses the driveway for the residence. The portion of the fence that traverses the driveway and connects with the south side of the house is a large, retractable gate.

{¶10} Captain Westfall testified that multiple law enforcement agencies took positions around the target residence a few hours before the raid and conducted surveillance as numerous people entered the fenced-in backyard. Meanwhile, an armored vehicle was waiting at a nearby facility for Captain Westfall's command. Once the gate to the property closed, he signaled for the armored vehicle, which breached the retractable gate at 10:41 p.m. Captain Westfall testified that, from the point in time that the retractable gate closed until the armored vehicle arrived to breach it, roughly twelve minutes elapsed. During that time, other officers conducted surveillance to ensure that no one was walking on the street outside the residence or leaving the residence. Captain Westfall testified that, once the gate was breached, the scene became the "most chaotic" he had ever seen with people "running, screaming, throwing money, [and] trying

to knock down the fencing to get out." A total of 52 law enforcement officers ultimately responded to the scene that evening, and 47 individuals were arrested.

{¶11} Detective Mark Hockman conducted surveillance from a nearby location during the time leading up to the raid. From his position, he could see portions of the backyard as well as the street leading to the property. Detective Hockman kept watch as the retractable gate to the property closed. He then saw the individuals in the backyard form "more or less [] a single file or duck line moving towards the direction of the north man door of the garage." Although Detective Hockman could not see the north side of the garage from his position, he knew there was a man door there and assumed that the individuals he saw were walking into the garage rather than huddling next to it. He testified that, a few minutes before the armored vehicle arrived, he noticed individuals leaving the garage area. He continued to watch as the armored vehicle arrived and breached the gate along with the SWAT team. Detective Hockman testified that the police ultimately seized over $52,000 that evening and $436 of that amount came from Mr. McCoy.

{¶12} Detective Hockman indicated that he had experience investigating dogfights and the observations he made at the residence after the raid allowed him to conclude that there was "a well-defined dogfighting operation going on there." Among other things, he observed a twelve-by-twelve foot ring in the garage covered with "blood soaked" carpet; break sticks, which are used to pry open a dog's mouth once it has latched onto another dog; and weighted chains. He stated that dogfights are "very secretive" and conducted by word of mouth such that they are not widely publicized.

{¶13} Detective Brian Boss testified that he acted as the lead operator for the Akron SWAT team when the raid ensued. He stated that his team was the first to breach the backyard

after the gate was compromised and that he immediately rounded the southeast corner of the house. In the area between the north side of the detached garage and the north fence line, he briefly observed approximately 30 to 40 people standing near the garage watching two men taunt two pit bulls on separate leashes. The crowd then scattered, and the SWAT team gave chase.

{¶14} Officer Jim Alexander was one of the officers who helped apprehend people who scattered during the raid. He testified that he chased two individuals, one of whom ran along the northern fence line in an attempt to leave the property. The person who ran along the fence line was the only person that Officer Alexander personally arrested that evening, and he confirmed that the person was Mr. McCoy.

{¶15} Officer Delvin Pickett, a member of the crime scene unit, testified that he took a video recording of the scene at the property after the raid occurred. The video recording documents numerous items related to dogfighting. Inside the detached garage at the property, Officer Pickett found a large, square, freestanding ring that looks to have been constructed from wood and other materials. The inside flooring of the ring was carpeted and had several long pieces of duct tape arranged in lines. Officer Pickett stated that both the lines of duct tape and the inside walls of the ring were covered in blood. The garage also contained buckets of water, sponges, and break sticks that were coated with "fresh and wet" blood.

{¶16} Apart from the detached garage, Officer Pickett also documented the inside of the freestanding trailer at the southeast corner of the backyard and a separate, fenced area that he found there. The trailer contained more buckets of water and sponges, a filthy shower area, and weighing scales. In the separate, fenced area, Officer Pickett found individual, enclosed cages for dogs. At the time that he recorded the scene, at least one dog was still confined in one of the cages in the fenced-in area.

{¶17} Officer Pickett also documented the numerous vehicles that were on scene when the raid commenced. Several of the vehicles were parked inside the enclosed backyard. Officer Pickett testified that he was able to observe kennels in a number of the vehicles that he recorded. At least one of the kennels had a dog inside of it. He also saw, while on the property, two injured dogs "[w]ith apparent bite marks" whose wounds appeared to be fresh.

{¶18} Officer Tim Harland testified that he works for the Summit County Humane Society and was present on the evening of the raid to secure the dogs on scene. He testified that he ultimately collected eight dogs from the property that evening, all of which were either pit bulls or pit bull mixes. Two of the dogs were taken to the hospital because they had "severe injuries." He described the dogs as having "very, very fresh," deep puncture wounds. He confirmed that he had experience dealing with dogs that had been bitten by other dogs and that the wounds he saw on the two dogs were consistent with those types of bite wounds.

{¶19} Maurice Wynn, Jr., one of Mr. McCoy's co-defendants, testified for the State pursuant to a plea agreement. Mr. Wynn agreed that he came to the target residence the evening of the raid to watch dogfights and that the owner of the residence, Alvin Banks, charged him $75 to see the fights. Mr. Wynn testified that Mr. Banks personally invited him to the fights by word of mouth. According to Mr. Wynn, he saw one dogfight that evening. He stated that the fight took place in the garage, lasted for several minutes, and ended before the police conducted their raid. Mr. Wynn agreed that other individuals were watching the fight too, but could not say who those individuals were or whether anyone placed bets that evening. Mr. Wynn stated that he could not identify anyone at the residence other than Mr. Banks.

{¶20} Robby Hollis, another of Mr. McCoy's co-defendants, also testified for the State pursuant to a plea agreement. Mr. Hollis admitted that he had been friends with Alvin Banks for

several years and, before the evening of the raid, had attended dogfights at Mr. Banks' residence on two separate occasions. Mr. Hollis testified that Mr. Banks invited him to the fights by word of mouth. He agreed that, during the two previous fights, he personally saw Mr. Banks collect money from people for admittance to the fights. According to Mr. Hollis, Mr. Banks was standing near the retractable gate when he arrived on the evening of the raid and waived him through without payment. He did, however, see Mr. Banks collect money from four or five other individuals as he made his way inside. Mr. Hollis indicated that he saw two injured dogs standing by the gate when he arrived, but missed the first dogfight that occurred that evening. He agreed that people were gambling on the dogs at the fights he previously attended at the residence.

{¶21} Mr. McCoy argues that his dogfighting conviction is based on insufficient evidence because the State failed to prove each essential element of his offense. He notes that none of the witnesses who testified were able to say that he paid money to see a dogfight or that he actually attended a dogfight that evening. According to Mr. McCoy, there were no witnesses who could place him at the property before the dogfight occurred rather than after.

{¶22} As previously noted, this Court has interpreted Section 959.16(A)(5) as requiring the State to prove either that a person (1) knowingly paid money or gave something of value for admission to a dogfight, or (2) knowingly was present at a dogfight. *Taylor*, 2016-Ohio-7953, at ¶ 15. Accordingly, the State was not required to prove that Mr. McCoy paid money or gave something of value for admission to the dogfight(s) at the target residence. His conviction can stand so long as the State set forth sufficient evidence that he was knowingly present at a dogfight. Viewing all the evidence in a light most favorable to the State, we must conclude that the State satisfied its burden of production on that issue.

{¶23} There is no dispute that Mr. McCoy was arrested at the target residence on the evening of the raid with $436 in his pocket. Moreover, the State produced evidence that, when the SWAT team arrived and announced themselves, he attempted to flee by running along the property's northern fence line. *See State v. Nichols*, 9th Dist. Summit No. 24900, 2010-Ohio-5737, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997) ("It is an established principle of law that '[f]light from justice * * * may be indicative of a consciousness of guilt.'"). There was testimony that the target residence was home to "a well-defined dogfighting operation" and one dogfight occurred inside its detached garage before the police arrived. There also was testimony that, after the retractable gate to the property closed, the individuals in the backyard formed a line and moved to the garage where that fight occurred. The individuals returned to the backyard after several minutes, and the retractable gate remained closed that entire time. Accordingly, a rational trier of fact could have concluded that no one else arrived after the gate closed and that the individuals who were present filed into the garage for the purpose of watching the fight.

{¶24} The State also produced, as evidence of the fight, testimony that the police seized eight dogs from the property that evening, two of whom were badly injured. There was testimony that the dogs' injuries were fresh, and the ring and break sticks inside the detached garage were covered in fresh blood. There also was testimony that the police collected approximately $52,000 that evening and that they found significant sums of money on the ground where it had been thrown when the raid commenced. Given his attempt to avoid apprehension, "the presence of the dogs, the behavior of the crowd, the clandestine nature of the event, and the large quantities of money that the crowd had on hand, a rational trier of fact could have concluded that [Mr. McCoy] was knowingly present at a dogfight that evening." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 22. *See also* former R.C. 2901.22(B)

(defining the circumstances in which a person acts "knowingly"). Mr. McCoy has not shown that the trial court erred when it denied his motion for acquittal. Thus, his third assignment of error is overruled.

{¶25} Mr. McCoy also argues that his conviction is against the manifest weight of the evidence, but he has not set forth a separate basis for his weight argument. "[S]ufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Mr. McCoy has not challenged any of the evidence the State set forth as "unreliable or lacking credibility." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. This Court will not develop a manifest weight argument on his behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. "We have already determined that his conviction is based on sufficient evidence, and [Mr. McCoy] has not shown that this is the exceptional case where the trier of fact lost its way in convicting him." *Taylor*, 2016-Ohio-7953, at ¶ 39. Accordingly, his second assignment of error is overruled.

ASSIGNMENT OF ERROR I

TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR BY OVERRULING MR. MCCOY'S OBJECTION AND PERMITTING THE SUMMIT COUNTY HUMANE OFFICER TO TESTIFY REGARDING THE TYPES OF INJURIES TO THE DOGS IN VIOLATION OF EVID. R. 702.

{¶26} In his first assignment of error, Mr. McCoy argues that the trial court erred when it allowed Officer Harland to testify "regarding explanations and clarifications of the type of injuries sustained by the dogs" that the police seized here. According to Mr. McCoy, Officer Harland was permitted to testify as an expert, despite the State's failure to comply with Criminal Rule 16(K).

{¶27} Criminal Rule 16(K) provides, in relevant part, that

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial * * *. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

By its own terms, the rule only applies to expert witnesses. *See* Crim.R. 16(K). Moreover, prosecutorial violation of the rule "are reversible only when there is a showing that: (1) the prosecution's failure to disclose was a willful violation of the rule; (2) knowledge of the information would have benefited the accused in the preparation of the defense; and (3) the accused suffered some prejudicial effect." *State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 16.

{¶28} Officer Harland testified that he has been a humane officer for 21 years, has considerable experience with injured dogs, and has personally observed hundreds of dogs with bite wounds they received from other dogs. He testified that he personally observed all of the dogs the police seized the evening of the raid and that two of the dogs were suffering from deep puncture wounds. He agreed, based on his knowledge and experience, that the wounds he observed on the two dogs were similar to past wounds he had seen in dogs that had been bitten by other dogs. Although it was not provided to the jury, the State produced to Mr. McCoy during discovery an animal welfare investigation report authored by the Humane Society. The report identifies Officer Harland as one of two reporting officers and describes two of the pit bulls seized from the target residence as being severely injured and bearing injuries consistent with having been fought.

{¶29} This Court has recognized that "[a] lay witness may offer opinions and inferences provided they are both rationally based on his perception and helpful to the jury's understanding of the testimony or determination of a fact in issue." *State v. Morgan*, 9th Dist. Medina No.

07CA0124-M, 2008-Ohio-5530, ¶ 30, citing Evid. R. 701. *Accord State v. Klein*, 9th Dist. Summit No. 26573, 2013-Ohio-3514, ¶ 18-19. For example, a police officer who has had occasion to observe intoxicated individuals may testify, without being qualified as an expert, that an individual with whom he or she interacted was intoxicated. *See Morgan* at ¶ 30. Likewise, an officer who has knowledge of the methamphetamine production process and sees various items of paraphernalia seized from a suspect's home may testify, without being qualified as an expert, that the home contained a methamphetamine lab. *See State v. Williams*, 9th Dist. Summit No. 25716, 2011-Ohio-6604, ¶ 11. In both instances, the officer's testimony is based on his or her own perception and is "helpful to the jury's understanding of the testimony or determination of a fact in issue." *Morgan* at ¶ 30. *See also Williams* at ¶ 11.

**{¶30}** Officer Harland observed the dogs at issue here and used his past experience to testify that their wounds were consistent with wounds inflicted by another dog. His testimony, therefore, was rationally based on his own perception and was offered to help the jury determine whether a dogfight had occurred that evening. Mr. McCoy has not shown that, under the foregoing circumstances, the State was required to tender Officer Harland as an expert. *See Morgan* at ¶ 30. Even assuming that Officer Harland testified as an expert here, however, Mr. McCoy has not demonstrated that he is entitled to relief for the State's purported violation of Criminal Rule 16(K). *See Sadeghi*, 2016-Ohio-744, at ¶ 16. As noted, the State provided Mr. McCoy with a copy of an animal welfare investigation report in advance of trial and that report summarized Officer Harland's conclusions. Mr. McCoy has made no attempt to explain why that report was deficient under Criminal Rule 16(K). Further, Officer Harland's testimony was not the only evidence that the State set forth to prove that a dogfight occurred at the target property that evening. Mr. Wynn, for instance, specifically testified that he saw a dogfight at the

property that evening. Thus, even assuming Officer Harland improperly testified as an expert, Mr. McCoy has not shown that his testimony prejudiced the result in this matter. *See Sadeghi* at ¶ 16. Mr. McCoy's first assignment of error is overruled.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT SENTENCED MR. MCCOY WITHOUT PROPERLY GIVING HIM ALL THE REQUIRED NOTIFICATIONS AS REQUIRED BY R.C. 2929.19(B)(4) AND CONCERNING POST-RELEASE CONTROL.

{¶31} In his fourth assignment of error, Mr. McCoy argues that the trial court erred when it sentenced him without properly informing him of (1) the potential sanctions he might incur for violating community control, and (2) post-release control. For the reasons set forth below, we reject his assignment of error.

{¶32} When an offender violates the terms of his or her community control sanction, a trial court "may impose a longer time under the same sanction, may impose a more restrictive sanction, or may impose a prison term on the offender * * *." R.C. 2929.19(B)(4). Revised Code Section 2929.19(B)(4) requires the court to notify an offender of the possible, foregoing sanctions. *Id*; *see also State v. Colburne*, 9th Dist. Summit No. 27553, 2015-Ohio-4348, ¶ 29. Mr. McCoy argues that, because he was not so notified, he is entitled to a resentencing.

{¶33} The trial court sentenced Mr. McCoy to serve one year of community control, commencing January 13, 2016. His community control obligation, therefore, expired in January 2017. "Where a defendant has completed his sentence, 'an appeal [from that sentence] is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction.'" *State v. Watson*, 9th Dist. Summit No. 22958, 2006-Ohio-2406, ¶ 4, quoting *State v. Berndt*, 29 Ohio St.3d 3, 4 (1987). Mr. McCoy has not set forth any evidence that he will suffer some collateral

disability or other loss as a result of his expired community control sentence. Accordingly, to the extent he challenges his sentence under Section 2929.19(B)(4), his assignment of error is moot, and we decline to address it. *See* App.R. 12(A)(1)(c).

{¶34} Mr. McCoy also argues that his sentence is void because the trial court failed to properly advise him of post-release control. *See State v. Leasure*, 9th Dist. Summit No. 25596, 2011-Ohio-3665, ¶ 4-7 (addressing post-release control error for completed sentence). The trial court, however, did not impose a prison term upon Mr. McCoy for his fourth-degree felony. The post-release control statute provides that "[a]ny sentence *to a prison term* for a felony of the * * * fourth * * * degree that is not [an offense of violence or a sex offense] shall include a requirement that the offender be subject to a period of post-release control of up to three years * * *." (Emphasis added.) R.C. 2967.28(C). The statute does not apply when the trial court does not sentence an offender to a prison term. *State v. Ortiz*, 9th Dist. Lorain No. 08CA009502, 2010-Ohio-38, ¶ 11. Because the trial court did not sentence Mr. McCoy to serve either an actual or suspended prison term, it was not required to advise him of post-release control. *See id.* Consequently, to the extent Mr. McCoy challenges his sentence on the basis of a defective post-release control notification, his assignment of error is overruled.

III.

{¶35} Mr. McCoy's first, second, and third assignments of error are overruled. His fourth assignment of error is overruled in part. This Court declines to address the remainder of his fourth assignment of error, as it is moot. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

SCHAFER, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.