[Cite as *State v. Beavers*, 2018-Ohio-2172.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

    v.

KERIEDA BEAVERS

    Appellant

C.A. No.    28485

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2016 02 0351

DECISION AND JOURNAL ENTRY

Dated: June 6, 2018

HENSAL, Judge.

{¶1}  Defendant-Appellant, Kerieda Beavers, appeals from her convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}  Shortly after 1:00 a.m., Ms. Beavers was walking alongside her former boyfriend, the victim in this matter, while his mother and a neighborhood friend were walking ahead of them. As the two groups were walking, three gunshots rang out, and the victim's mother and her friend took cover behind a fence. The friend waited approximately thirty seconds before calling out to the victim. Ms. Beavers then answered and indicated all was well, so the friend and the victim's mother continued walking. Shortly thereafter, however, they learned that the victim had been shot. The victim sustained a single gunshot wound to the head and died later that day. When treating him, paramedics discovered a revolver lying on the ground beneath his back, and

subsequent testing confirmed that the bullet that caused his death had been fired from the revolver. The police ultimately arrested Ms. Beavers in connection with the shooting.

{¶3}   A grand jury indicted Ms. Beavers on one count of murder, felony murder, and felonious assault, as well as three attendant firearm specifications. The matter proceeded to trial, at the conclusion of which a jury found Ms. Beavers not guilty of murder, but guilty of her remaining counts and specifications. The trial court then merged her felony murder and felonious assault counts for purposes of sentencing, as well as the specifications linked to those counts. The court sentenced her to life in prison with parole eligibility after 18 years.

{¶4}   Ms. Beavers now appeals from her convictions and raises two assignments of error for our review.

## II.

### ASSIGNMENT OF ERROR I

APPELLANT BEAVERS' CONVICTIONS WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

{¶5}   In her first assignment of error, Ms. Beavers argues that her convictions are based on insufficient evidence. Specifically, she argues that the State failed to present sufficient evidence that she was the individual who shot the victim. We disagree.

{¶6}   Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶7} "[I]dentity of the perpetrator is an essential element that must be proved beyond a reasonable doubt." *State v. Johnson*, 9th Dist. Lorain No. 13CA010496, 2015-Ohio-1689, ¶ 13. "As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9. Because Ms. Beavers limits her sufficiency challenge to the issue of identity, we confine our analysis to that issue. *See State v. Webb*, 9th Dist. Summit No. 27424, 2015-Ohio-2380, ¶ 6.

{¶8} The victim's mother testified that she was with the victim, Ms. Beavers, and a neighborhood friend on the night of the shooting. As the time approached 1:00 a.m., the four of them decided to walk to a neighborhood drive-thru to purchase alcohol. The victim's mother testified that she and her friend walked side by side while the victim and Ms. Beavers trailed behind them. To her, it sounded like the victim and Ms. Beavers were arguing, which was a common occurrence when they drank. She stated that the two had dated on and off for about three years and, during that time, Ms. Beavers had become physically aggressive with the victim when they drank and argued. At the time of the shooting, the victim and Ms. Beavers were no longer dating, and there was testimony that the victim had started seeing another woman.

{¶9} The victim's mother stated that, as the group approached the drive-thru, they saw that its garage door was down. She and her friend then stopped walking because they believed the store had already closed for the evening. Ms. Beavers, however, was undeterred and continued walking with the victim to verify that the store was closed. Rather than wait, the victim's mother and her friend turned around and began walking back without the victim and Ms. Beavers. At some point, the victim and Ms. Beavers also began walking back.

{¶10} The victim's mother testified that she and her friend were about 20 to 30 feet ahead of the victim and Ms. Beavers as they walked back, but she could still hear them arguing. Suddenly, she heard three gunshots, and her friend pulled her behind a nearby fence. According to the victim's mother, no one screamed or yelled for help after the shots rang out. She testified that, as they waited by the fence, her friend shouted the victim's name, and Ms. Beavers responded, "[y]eah." Because gunshots were a relatively common occurrence in the neighborhood and Ms. Beavers did not indicate that anything was wrong, the victim's mother and her friend then continued walking. She testified that she never turned to look back after the gunshots. Instead, her niece found her several minutes later and informed her that someone had shot the victim. According to the victim's mother, she never saw any other people or cars around when she heard the three gunshots.

{¶11} The neighborhood friend likewise testified that she, the victim's mother, the victim, and Ms. Beavers were walking back from the store when she heard three gunshots. She did not recall hearing the victim and Ms. Beavers arguing during their walk, but agreed that they were trailing behind her and the victim's mother. She stated that, when the gunshots rang out, she pulled the victim's mother behind a gate and waited an estimated 30 seconds before calling out to the victim. Ms. Beavers then responded, "[y]eah," in "a normal tone" of voice, and the friend and the victim's mother decided to keep walking. The friend testified that Ms. Beavers never screamed or indicated that anything was wrong.

{¶12} The victim's body was found near the sidewalk outside a residence where his friend, M.B., lived. M.B. testified that she was home that evening and several people, including L.M., were visiting her when they heard gunshots. A few minutes after they heard the shots, L.M. and M.B. went outside and found the victim's body on the ground. Both testified that no

one was near the victim's body when they first approached, but they saw Ms. Beavers some distance away, walking in the direction of her house. Both testified that, when Ms. Beavers saw them, she quickly came back to the victim's body and began screaming that someone had shot him. According to M.B., Ms. Beavers initially kept saying "[t]hey did it," but then said L.M. had shot the victim. Meanwhile, L.M. recalled Ms. Beavers yelling "[t]hey shot him in the head" before she blamed him for the shooting. M.B. and L.M. testified that the victim was lying flat on his back when they found him.

{¶13} The paramedics who arrived to treat the victim found a .22 caliber, nine-shot revolver beneath his body in the area near the small of his back. There was testimony that the revolver contained six unfired bullets and three empty casings. A firearms analyst from the Bureau of Criminal Investigation ("BCI") tested the revolver and determined that it was operable. He further determined that the bullet extracted from the victim's head had been fired from the revolver. Though the revolver was swabbed for DNA, the analyst who tested the swabs only obtained limited results. He testified that he located the DNA of at least three individuals on the trigger, but the major contributor was an unknown male and he had insufficient information to draw any conclusions about the remaining contributors. As for DNA he obtained from the handled areas of the revolver (i.e., any area that an individual could have touched), he testified that he also detected a mixture. He stated that he was able to exclude Ms. Beavers as a contributor with regard to the mixture on the handled areas of the revolver, but the results were otherwise insufficient for comparison purposes (i.e., to include any particular individual as a contributor). He testified that a number of factors can influence whether a person's DNA will be found on an item he or she has handled.

{¶14} There was testimony that the victim's cousin arrived on scene before the paramedics. She admitted that she attacked Ms. Beavers after she asked what happened and Ms. Beavers responded, "I don't know. I didn't do it. [L.M.] did it." She testified that she attacked Ms. Beavers because it did not appear to her that Ms. Beavers was upset.

{¶15} The police arrived shortly after the victim's cousin attacked Ms. Beavers. There was testimony that, once freed of the victim's cousin, Ms. Beavers walked over to one of their cruisers and lay down on the ground in front of it. At some point, Detective Carl Elam attempted to speak with her and determine whether she needed medical attention. He testified that Ms. Beavers was hysterical when he spoke with her, crying and waving her arms. When he asked her what happened, Ms. Beavers stated that she heard a car speed up behind her as she was walking down the street, heard shots ring out, and dove out of the way. She then stated that, after she dove out of the way, "the car stopped, a man got out, and finished off [the victim]." Detective Elam testified that a second crew of paramedics treated Ms. Beavers when they arrived and took her to the hospital. At the hospital, it was determined that her blood serum alcohol content was .339.

{¶16} Dr. George Sterbenz performed the victim's autopsy and opined that the victim ultimately died as a result of a single gunshot wound to the head. He testified that the bullet entered under the victim's chin at a slight angle and lodged in his brain. Though the victim survived for more than twelve hours after the shooting, Dr. Sterbenz opined that the gunshot wound he sustained would have rendered him immediately unconscious. He also opined that the victim died as the result of a homicide rather than a suicide. Dr. Sterbenz stated that the victim's entry wound did not bear any signs of a contact injury and, in fact, had the appearance of a long-

range injury. Even so, due to the low caliber of the firearm involved in the shooting, Dr. Sterbenz testified that the gun could have been fired from as close as six inches away.

{¶17} Ms. Beavers argues that her convictions are based on insufficient evidence because the State only set forth evidence that she was with the victim when he was shot. She notes that analysts were unable to detect the presence of any gunshot residue on her hands or clothing. She further notes that there were no eyewitnesses to the shooting or testimony that she had a gun that evening. According to Ms. Beavers, the fact that she "was the only known or identifiable person to be in the vicinity of [the victim] when he was shot and killed does not constitute sufficient evidence to sustain [her] convictions."

{¶18} With regard to gunshot residue, the State presented the testimony of a forensic analyst at BCI. The analyst testified that gunshot residue is formed from particles that contain three components: lead, barium, and antimony. Because each component occurs naturally in the environment, she explained that all three components must be present together in a particle before a BCI analyst will conclude that the particle is consistent with gunshot residue. Although the analyst found three two-part particles (lead and barium) and a number of one-part particles (two bariums, four antimonies, and twenty-one leads) when testing the samples from Ms. Beavers hands, she did not detect any particles with all three components. Therefore, she was unable to conclude that Ms. Beavers had particles consistent with gunshot residue on her hands. She testified, however, that a number of factors can cause gunshot residue to be removed or transferred. She noted that Ms. Beavers had dirt and blood on her hands when they were sampled. She also agreed that weather conditions, being involved in a physical confrontation with someone, or causing your hands to have contact with the ground could affect an analyst's ability to detect any gunshot residue particles.

{¶19} Detective Tanisha Stewart helped investigate the victim's shooting. She testified that she found it "extremely unusual" that the revolver used to shoot the victim was found underneath his back. She clarified that, in her twenty-two years as an officer, she had never seen a suicide where the victim had dropped the gun and fell backwards onto it. Likewise, she was unaware of any drive-by or walk-by shootings where the perpetrator(s) had left the murder weapon beneath the victim's body. She testified that the perpetrators in those types of shootings generally took measures to hide or dispose of their weapons.

{¶20} Viewing all of the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved the element of identity beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus. Ms. Beavers was walking alongside the victim immediately before three gunshots rang out. There was testimony that the revolver found beneath him contained three shell casings, and the bullet extracted from his skull had been fired from that revolver. Dr. Sterbenz testified that the victim's injury would have rendered him immediately unconscious, such that it would have been obvious that he was injured. Nevertheless, when a neighborhood friend called out to the victim after hearing three gunshots, Ms. Beavers indicated all was well in "a normal tone" of voice. She also gave several inconsistent statements when various individuals asked her who had shot the victim. Thus, a rational trier of fact could have concluded that the State set forth sufficient, circumstantial evidence that it was Ms. Beavers who shot the victim. *See Taylor*, 2015-Ohio-403, at ¶ 9. Ms. Beavers' first assignment of error is overruled.

ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

{¶21} In her second assignment of error, Ms. Beavers argues that her convictions are against the manifest weight of the evidence. For the reasons that follow, we reject her argument.

{¶22} If a defendant asserts that his or her convictions are against the manifest weight of the evidence:

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). This Court, however, will not undertake a manifest weight analysis when an appellant has failed to develop an argument on his or her own behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32.

{¶23} Ms. Beavers' manifest weight argument consists of a blanket assertion that, because her convictions are based on insufficient evidence, they are likewise against the manifest weight of the evidence. Yet, "sufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Ms. Beavers has not challenged any of the State's evidence as "unreliable or lacking credibility." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. This Court declines to fashion a manifest weight argument on her behalf. *See State v. McCoy*, 9th Dist. Summit No. 28103, 2017-Ohio-4163, ¶ 25. "We have already determined that [Ms. Beavers' convictions are] based on sufficient evidence, and [she] has not shown that this is the exceptional case where the trier of fact lost its way in convicting [her]." *State v. Taylor*, 9th Dist. Summit No. 28091, 2016-Ohio-7953, ¶ 39. Accordingly, her second assignment of error is overruled.

III.

**{¶24}** Ms. Beavers' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.