[Cite as *State v. Penn*, 2020-Ohio-3158.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

JAUVAUGHN PENN

    Appellant

C.A. No.     29296

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    C4 2018-04-1369

DECISION AND JOURNAL ENTRY

Dated: June 3, 2020

TEODOSIO, Judge.

{¶1} Defendant-Appellant, Jauvaughn Penn, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} One Monday in February 2018, shortly before 4:00 p.m., the Akron Fire Department received a 911 call about a house fire on West Miller Avenue. Mr. Penn's girlfriend, C.M., had rented the house for herself and her children, but was not present when the fire broke out. She had received her keys just two days earlier and was in the process of moving in. The fire destroyed the items she had already brought there and rendered the house uninhabitable.

{¶3} Up until mid-February, Mr. Penn, C.M., her four children, and her aunt had shared a home on Hampton Road. Yet, Mr. Penn and C.M.'s relationship was tumultuous, and several events that occurred around that time led to a falling out between the two. The day of the fire, C.M. left her new home by 7:00 a.m. She returned to the Hampton Road residence for the purpose

of readying her children for school and removing more of her belongings. Mr. Penn was there when she arrived, however, and indicated that he would not allow her to remove anything else from the home. Consequently, after C.M. took her children to school, she went to the courthouse and filed for an ex parte protection order against Mr. Penn. The ex parte order called for him to immediately vacate the Hampton Road residence and granted C.M. exclusive possession.

{¶4} A sheriff's deputy served Mr. Penn with the ex parte order at the Hampton Road residence and was still on site with him when C.M. returned. Mr. Penn and C.M. then quarreled, forcing the deputy to separate them. After C.M. entered the residence, Mr. Penn packed a few of his belongings and left with a friend who had come to pick him up. At Mr. Penn's request, the friend drove him to West Miller Avenue. The friend parked outside C.M.'s new house while Mr. Penn exited the car, disappeared behind the house for a few minutes, and returned to the car. The friend and Mr. Penn then drove away. Within ten to fifteen minutes of their departure, the fire department was notified of a fire at the house. After extinguishing the fire and inspecting the premises, fire investigators determined that the fire had been set intentionally.

{¶5} A grand jury indicted Mr. Penn on one count of aggravated arson and one count of burglary. The matter proceeded to trial, at the conclusion of which a jury found him guilty of both counts. Mr. Penn then filed a motion for new trial, and the trial court denied it. The court sentenced him to eight years in prison on his aggravated arson count and six years in prison on his burglary count. It further ordered him to serve those sentences consecutively for a total of fourteen years in prison.

{¶6} Mr. Penn now appeals from his convictions and raises seven assignments of error for our review. To facilitate our analysis, we rearrange several of his assignments of error.

II.

## ASSIGNMENT OF ERROR SIX

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED QUESTIONS DURING VOIR DIRE WHICH CAUSED PREJUDICE FOR THE APPELLANT.

{¶7} In his sixth assignment of error, Mr. Penn argues that the trial court abused its discretion when it allowed the State to pose a certain hypothetical to the jury venire during voir dire. According to Mr. Penn, the hypothetical was improper because it directly paralleled the facts herein and invited the venire to form an opinion about the case in advance of trial. We do not agree.

{¶8} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine*, 66 Ohio St.3d 414, 418 (1993). "Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 44. A trial court may be found to have abused its discretion if it rules in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶9} "[C]ounsel is afforded reasonable latitude on the voir dire examination." *State v. Saxton*, 9th Dist. Lorain Nos. 02CA008029 and 02CA008030, 2003-Ohio-3158, ¶ 43.

> "The scope of the inquiry will not be confined strictly to the subjects which constitute grounds for the sustaining of a challenge for cause; but if it extends beyond such subjects it must be conducted in good faith with the object of obtaining a fair and impartial jury and must not go so far beyond the parties and the issues directly involved that it is likely to create a bias, a prejudice, or an unfair attitude toward any litigant."

*State v. Atalla*, 157 Ohio App.3d 698, 2004-Ohio-3414, ¶ 11 (9th Dist.), quoting *Vega v. Evans*, 128 Ohio St. 535 (1934), at paragraph two of the syllabus. "The scope of voir dire * * * varies depending on the circumstances of each case." *State v. Bedford*, 39 Ohio St.3d 122, 129 (1988).

{¶10} When conducting her voir dire, the prosecutor discussed with the jury venire the concepts of reasonable doubt and circumstantial evidence. One potential juror indicated that reasonable doubt meant a person would "have absolutely no doubt" about a defendant's guilt. In correcting that misunderstanding, the prosecutor accurately defined the term and provided the venire with several hypothetical situations wherein one might conclude that the standard had been met. The prosecutor then went on to discuss the concepts of direct and circumstantial evidence. She provided the venire with two hypothetical situations to help explain circumstantial evidence. Her second hypothetical provided:

> [S]o let's say that I'm driving into work last week and [A.] cuts me off in the parking garage.
>
> So we're walking into work and I say, "You are not going to be in that parking spot for long," and say the day after [M.] walks me over to her parking spot and I have a bat. And then [M.] leaves me alone and let's say, [potential juror], that you are watching me in the garage and you see me walk up to her car. And then you turn around.
>
> Let's say a couple minutes later [A.] reports that her car windows have been bashed in. What is the logical inference that we can make? Who do we think bashed [A.'s] car windows in?

The foregoing hypothetical drew an objection from Mr. Penn, as he believed the prosecutor had gone "too much into the specific facts of this case * * *." He acknowledged that he had not been charged with breaking windows, but argued that he had been accused of engaging in "a similar fact pattern to start the fire." After the prosecutor represented that it was her intention to explain circumstantial evidence to the jury through logical inference, the court overruled the objection.

{¶11} Mr. Penn argues that the trial court abused its discretion when it overruled his objection. He maintains that the prosecutor's hypothetical was improper because it paralleled the facts herein and "predispose[d] jurors to react a certain way to the anticipated evidence."

{¶12} Upon review, Mr. Penn has not shown that the trial court abused its discretion when it overruled his objection to the prosecutor's second hypothetical. The prosecutor did not use the specific facts of this case to fashion her hypothetical. Moreover, even if she extrapolated from those facts, "prospective jurors need not be totally ignorant of the facts and issues involved [in a case] to be qualified as jurors." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 49. They are qualified to serve so long as they can remain fair and impartial. *See id.* The prosecutor's hypothetical did not ask the venire to commit to a position on any given issue. *Compare State v. Lundgren*, 73 Ohio St.3d 474, 481 (1995); *State v. Bedford*, 39 Ohio St.3d 122, 129 (1988). Nor did it "'go so far beyond the parties and the issues directly involved that it [was] likely to create a bias, a prejudice, or an unfair attitude toward [Mr. Penn].'" *Atalla*, 2004-Ohio-3414, ¶ 11, quoting *Vega*, 128 Ohio St. 535, at paragraph two of the syllabus. The record supports the conclusion that the prosecutor posed her hypotheticals to the jury as a means of explaining various legal concepts (i.e., beyond a reasonable doubt and circumstantial evidence). Moreover, the trial court specifically instructed the jury not "to place any significance upon the questions asked [during voir dire] as to how they may pertain to the trial." *See State v. Garner*, 74 Ohio St.3d 49, 59 (1995) ("A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge."). Because Mr. Penn has not shown that the trial court abused its discretion when it overruled his objection to the prosecutor's voir dire, his sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORD THAT THERE WAS SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.

{¶13}   In his fourth assignment of error, Mr. Penn argues that his convictions are based on insufficient evidence.  We disagree.

{¶14}   Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury."  *State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 25, citing *Thompkins* at 386.  "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"  *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact."  *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶15}   "No person, by means of fire or explosion, shall knowingly * * * [c]ause physical harm to any occupied structure * * *."  R.C. 2909.02(A)(2).  Physical harm to property occurs if a person causes "any tangible or intangible damage to [it] that, in any degree, results in loss of its value or interferes with its use or enjoyment."  R.C. 2901.01(A)(4).  "A person acts knowingly, regardless of purpose, when [he] is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature."  R.C. 2901.22(B).  The phrase "occupied structure" includes a house that is "maintained as a permanent or temporary dwelling, even though it is temporarily

unoccupied and whether or not any person is actually present." R.C. 2909.01(C)(1). Whoever commits the foregoing offense is guilty of aggravated arson. R.C. 2909.02(B)(1).

{¶16} A person may not,

> by force, stealth, or deception, * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense * * *.

R.C. 2911.12(A)(2). A person trespasses if he "[k]nowingly enter[s] * * * the land or premises of another * * *" without privilege to do so. R.C. 2911.21(A)(1). *See also* R.C. 2911.10 (defining trespass, for purposes of the burglary statute, as a violation of R.C. 2911.21). Whoever commits the foregoing offense is guilty of burglary. R.C. 2911.12(D).

{¶17} C.M. testified that she and Mr. Penn were romantically involved for about two years before the fire. The two lived together in a house on Hampton Road along with her four children and her aunt. C.M. admitted that she and Mr. Penn frequently argued. About twelve days before the fire, one of their fights turned violent. C.M. destroyed some of Mr. Penn's possessions, and he called the police. The officers informed C.M. and Mr. Penn that one of them would have to leave, so C.M. decided to go to her mother's house. She testified that she left her children with her aunt and began looking for a new place to live. According to C.M., Mr. Penn called her "a million times" while she was gone and was very upset when he learned that she had signed a lease on a new house. From that point forward, C.M. testified, things continued to escalate.

{¶18} Three days before the fire, Mr. Penn posted several inappropriate pictures of C.M. on social media. The pictures embarrassed her greatly, and C.M. vowed that she would get even with Mr. Penn. She explained, however, that she meant to do so by refusing to relinquish their lease when it came time for her to leave the house on Hampton Road. The following day (i.e., two days before the fire), she received the keys to her new house on West Miller Avenue and began

the moving process. She rented a U-haul that same day, transferred many of her possessions to her new house, and slept there that night. She stated that Mr. Penn called her around 4:00 a.m. and, at one point during their conversation, scared her by indicating that he knew where she lived.

{¶19} C.M. testified that she stayed at the new house the following evening as well. The next morning (i.e., the day of the fire), she got dressed at the new house and headed back to the house on Hampton Road to take her children to school. Although she had planned on collecting more things from the house, Mr. Penn was there when she arrived and would not allow her to remove anything else. Accordingly, after she took her children to school, C.M. went to the courthouse for an ex parte protection order. The order granted her exclusive possession of the Hampton Road house and commanded Mr. Penn to vacate the premises.

{¶20} C.M. estimated that she arrived back at the Hampton Road house around 1:30 p.m. The sheriff who had come to serve Mr. Penn with the ex parte order was still there when she arrived, and Mr. Penn was in the process of clearing out his belongings. C.M. testified that Mr. Penn eventually left with a friend who had come to give him a ride, and she remained at the house. Sometime around 4:00 p.m., she received a call from her new landlord, indicating that her new house was on fire. C.M. testified that the fire destroyed everything she had brought to the house. She estimated that those items were valued at more than $6,000.

{¶21} Deputy Michael Hawsman served Mr. Penn with the ex parte order at the Hampton Road house. He testified that Mr. Penn was angry when he saw the order and became even angrier when C.M. arrived. The two began to argue, and the deputy was forced to separate them. The deputy testified that a man later came to the house to pick up Mr. Penn.

{¶22} Mr. Penn's friend confirmed that he picked up Mr. Penn at the Hampton Road house on the day of the fire. He agreed that State's Exhibit 3 was a photograph of his car. At Mr.

Penn's request, the friend drove him to a house on West Miller Avenue. He testified that he waited inside the car while Mr. Penn got out, walked up the driveway, disappeared behind the house for several minutes, and returned to the car. Although he never saw anything in Mr. Penn's hands, the friend confirmed that Mr. Penn was a smoker and routinely carried a lighter. He indicated that, at the time he drove Mr. Penn to the house on West Miller Avenue, he did not know who lived there or why Mr. Penn wanted to go to there.

{¶23} A resident of West Miller Avenue, who lived across the street from C.M.'s house, also testified for the State. He indicated that he was feeding his son lunch when he saw a car pull up outside the house across the street. He confirmed that the car depicted in State's Exhibit 3 matched the one he saw outside that day. As he watched the car, he saw a black male get out, walk around the back of the house, and return to the car shortly thereafter. He then saw the car drive away. The resident testified that, within ten minutes, fire trucks pulled up outside the house. He confirmed that, between the time the black man left and the time the fire trucks arrived, he did not see anyone else approach the house.

{¶24} A crime analyst for the Akron Police Department testified that she examined Mr. Penn's cell phone records in connection with this investigation. She explained that several calls he made or received on the day of the fire resulted in incoming or outgoing signals that allowed her to pinpoint his position, relative to the cell phone towers that serviced his calls. She testified that the records showed Mr. Penn was still in the area of Hampton Road around 2:00 p.m., but that he began to travel shortly thereafter. Between 3:45 p.m. and 3:51 p.m., the records showed that Mr. Penn was in the area of West Miller Avenue. There was testimony that the police were dispatched to West Miller Avenue at 3:54 p.m. in response to a 911 call about the fire.

{¶25} Two members of the Akron Fire Department's Fire Investigation Unit testified about the fire. Investigator Andrew Hoch responded to the scene of the fire after it was extinguished and took pictures inside and outside of the house. The pictures showed significant damage to the first floor of the house, with extremely dark charring on floor of the dining room near the back, sliding glass patio door. Fireman Hoch testified that the heaviest area of char usually indicates the point of origin for a fire, so his department concluded that the fire herein originated in the dining room. He testified that samples were taken from that area to test for ignitable liquids, but none were detected. Further, he testified, the department was unable to determine that there were any accidental explanations for the fire, such as the presence of a faulty electrical outlet. He agreed that a fire of the magnitude that occurred herein could have been caused by an open flame without the use of an accelerant. While he was unable to say who had started the fire, he testified that it had been intentionally set.

{¶26} Investigator Matthew D'Avello testified that he acted as a follow-up investigator for Investigator Hoch. He was never able to set foot inside the West Miller Avenue house because it was boarded up by the time he arrived there. Nevertheless, he reviewed the pictures Investigator Hoch had taken inside the house, interviewed the neighbor across the street, interviewed C.M., attempted to reach Mr. Penn, and subpoenaed Mr. Penn's cell phone records. Investigator D'Avello testified that fire investigations are often pending for some time and, as an investigation unfolds, investigators can learn additional facts that impact their determination about the cause of a fire. Much like Investigator Hoch, he testified that the darkened, charred area of C.M.'s dining room was the origin point for the fire. He stated that it was impossible the fire had started in either the basement or an upstairs bedroom, given the burn patterns that were present in the dining room. Additionally, he rejected the possibility that the fire had been caused by an unattended cigarette,

as the burn pattern he observed was distinct from the type of burn pattern that occurs with a slow, smoldering fire. He opined, based on his experience, that the fire had burned for 15 to 30 minutes before it was extinguished. According to the investigator, the only possible ignition source for the fire was an open flame, as the fire department eliminated every other possibility. Investigator D'Avello ultimately opined, based on his entire investigation, that Mr. Penn was the individual who set the fire.

{¶27} Mr. Penn argues that his convictions are based on insufficient evidence because the State did not establish that he committed either offense. According to Mr. Penn, the testimony of Investigator Hoch and Investigator D'Avello was the only evidence the State presented to link him to the fire and to show that it started inside the house. He argues that their testimony was inadmissible, so it could not serve as the basis for his convictions. *See* Discussion of the First and Second Assignments of Error, *infra*. Because the State failed to prove how or why the fire began, Mr. Penn asserts, the record contains insufficient evidence in support of his convictions.

{¶28} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, that Mr. Penn committed the offenses of aggravated arson and burglary. *See Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus. The State set forth evidence that the fire started in the dining room at the back of C.M.'s house and that authorities were notified of the fire at 3:54 p.m. The evidence showed that Mr. Penn came to the house within ten minutes of the fire, walked to the back, remerged after a few minutes, and instructed his friend to drive away. There was testimony that, directly before he came to the house, Mr. Penn had been served with an ex parte order, forcing him to vacate his home in favor of C.M. Further, there was testimony that he was angry at C.M. for leaving and had planned on stopping her from removing any more possessions from their home. The fire

department was not able to identify any possible ignition sources for the fire apart from an open flame, and there was testimony that Mr. Penn habitually carried a lighter with him. Although no one saw him set the fire, the jury reasonably could have inferred that he did so, given the timing of the fire relative to his trip to the house and the events leading up to the fire. *See id.* at paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value * * *.").

{¶29} Mr. Penn primarily challenges the sufficiency of the State's evidence on the basis that some of that evidence was improperly admitted at trial. Yet, in reviewing the sufficiency of the evidence, an appellate court must consider "all evidence presented by the State in its case in chief, *whether such evidence was properly admitted or not*." (Emphasis added.) *State v. Dixon*, 9th Dist. Medina Nos. 11CA0065-M, 11CA0087-M, 2012-Ohio-4428, ¶ 18, citing *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, ¶ 19. The question of whether certain evidence ought not to have been admitted is, therefore, not relevant to our sufficiency determination. Upon review, Mr. Penn has not shown that his convictions are based on insufficient evidence. As such, his fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR ONE

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED EXPERT TESTIMONY BY TWO WITNESSES OVER OBJECTIONS, WHEN THE WITNESSES WERE NOT QUALIFIED AS EXPERT WITNESSES.

{¶30} In his first assignment of error, Mr. Penn argues that the trial court erred when it allowed two of the State's witnesses to testify as experts. Specifically, he argues that the court should not have permitted Investigator Hoch and Investigator D'Avello to offer any opinions or draw any conclusions about the fire, as they were never qualified as experts. For the following reasons, we reject his argument.

{¶31} A witness may offer an expert opinion only if he has prepared a written report and it has been disclosed in accordance with the strictures of Crim.R. 16(K). Expert opinion testimony must relate to matters beyond the common knowledge of the jury, must be relevant and reliable, and must be given by one qualified to speak as an expert due to specialized knowledge or experience. Evid.R. 702. Conversely, lay opinion testimony is admissible so long as it is "rationally based on the perception of the witness" and "helpful to a clear understanding of [his] testimony or the determination of a fact in issue." Evid.R. 701. This Court reviews for an abuse of discretion a trial court's decision to admit lay opinion testimony under Evid.R. 701. *State v. Heller*, 9th Dist. Lorain No. 18CA011304, 2019-Ohio-4722, ¶ 7. A trial court may be found to have abused its discretion if it rules in an unreasonable, arbitrary, or unconscionable manner. *Blakemore*, 5 Ohio St.3d at 219.

{¶32} As previously noted, Inspector Hoch and Inspector D'Avello investigated the fire herein and testified about various aspects of their investigation. Both testified about the fire's point of origin, the fact that no accelerants were detected, and the outcome of their investigation (i.e., that the fire had been set intentionally). Although Inspector Hoch testified mainly in generalities, Inspector D'Avello offered several specific opinions. He opined that the fire burned for 15 to 30 minutes, that an unattended cigarette could not have caused it, that it was caused by an open flame, and that Mr. Penn started it. Mr. Penn objected numerous times as each investigator testified. He argued that their testimony lacked a proper foundation and that the State was eliciting expert testimony without the investigators having been tendered or qualified as experts. Though the court sustained several of his objections to specific questions, it admitted the foregoing testimony.

{¶33} Mr. Penn argues that the trial court abused its discretion when it allowed the investigators to testify how, when, and why the fire started. He argues that their testimony exceeded the scope of lay opinion testimony permitted by Evid.R. 701. He further argues that their testimony was inadmissible under Evid.R. 702 because neither investigator demonstrated that he possessed the qualifications necessary to testify as an expert. Mr. Penn asserts that he was prejudiced by the admission of their testimony because it was the only evidence the fire was intentionally set and that it began inside the house. According to Mr. Penn, without that testimony, the State would not have been able to prove that an arson occurred or that he entered the home to set it (i.e., that he committed a burglary).

{¶34} "Whether or not 'origin' and 'cause' require an expert opinion for their establishment depends upon the facts and circumstances of each case." *Fidelity & Guaranty Ins. Underwriters, Inc. v. Gary Douglas Elec., Inc.*, 48 Ohio App.2d 319, 322 (9th Dist.1974). Under these facts and circumstances, we cannot conclude that the trial court abused its discretion when it allowed Investigator Hoch and Investigator D'Avello to testify that the most likely point of origin for the fire was the floor of C.M.'s dining room. Investigator Hoch personally observed the damage from the fire, and Investigator D'Avello reviewed his photographs from the scene. Both men were experienced firefighters and well-versed in fire investigation. They both explained that fire investigators routinely determine how fires originate and that a fire's point of origin may be determined based upon levels of charring. Investigator Hoch's photographs clearly showed that the floor of C.M.'s dining room was the area of the house with the most significant charring. Because the investigators' testimony about the fire's most likely point of origin was rationally based on their perceptions as qualified investigators and was helpful to the jury, we cannot conclude that the court erred by admitting it. *See State v. McCoy*, 9th Dist. Summit No. 28103,

2017-Ohio-4163, ¶ 29-30; *State v. Klein*, 9th Dist. Summit No. 26573, 2013-Ohio-3514, ¶ 18-19; *State v. Williams*, 9th Dist. Summit No. 25716, 2011-Ohio-6604, ¶ 11. *See also* Evid.R. 701.

{¶35} As for the remaining opinions the investigators offered, the record reflects that any error in the admission of their testimony was harmless beyond a reasonable doubt. *See State v. Boaston*, Slip Opinion No. 2020-Ohio-1061, ¶ 60-71; *State v. Graham*, 9th Dist. Medina No. 3052-M, 2001 WL 22482, *6 (Jan. 10, 2001). The State set forth overwhelming evidence that Mr. Penn set the fire at C.M.'s house. *See State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, ¶ 37. The evidence showed that she left the house more than eight hours before the fire started, making it highly unlikely that it was caused by any negligence on her part. The evidence showed that Mr. Penn was angry with her, that he had behaved vindictively toward her in the past when she had upset him (e.g., by posting inappropriate pictures of her on social media), and that he did not want her to move out. It showed that, shortly before the fire, he was ordered to immediately vacate the house on Hampton Road in favor of C.M., that he had no knowledge the order was forthcoming, and that he was angry when the sheriff served him with it. The evidence showed that Mr. Penn and C.M. argued at the Hampton Road house and, following that exchange, Mr. Penn asked his friend to drive him to C.M.'s house. Mr. Penn did not inform his friend that the house was C.M.'s. Nor did he indicate why they were there. The evidence showed that he walked around the back of the house, remained there for a few minutes, returned to his friend's car, and left the area. Within minutes of his departure, the fire was reported, and the evidence showed that its most likely point of origin was the dining room floor. There was evidence that the dining room was located at the back corner of the house, just off a sliding glass door, in the area toward which Mr. Penn had been seeking walking. Accordingly, the State set forth a wealth of circumstantial evidence implicating Mr. Penn. *See Jenk*s, 61 Ohio St.3d 259, at paragraph one of the syllabus.

**{¶36}** The record also supports the conclusion that the additional opinion testimony Investigator Hoch and Investigator D'Avello offered did not impact the verdict in this matter. *See Harris* at ¶ 37. Many of the opinions they offered were merely cumulative of other evidence presented at trial. For instance, Inspector D'Avello's testimony that the fire burned for 15 to 30 minutes was cumulative of the evidence that the fire department was notified of the fire at 3:54 p.m. and that fire trucks arrived within ten minutes of Mr. Penn's departure. *See Boaston* at ¶ 64. Likewise, his opinion that Mr. Penn caused the fire was simply based on his review of the evidence, including Mr. Penn's presence at the scene immediately before the fire and his tumultuous relationship with C.M. The jury had that same evidence before it at trial and was able to draw its own conclusion. It is also unclear how the investigators' testimony that no accelerants were detected harmed Mr. Penn. If anything, that testimony was helpful to the defense, as the presence of an accelerant would have lent weight to the conclusion that an arson had occurred. Because the evidence against Mr. Penn was overwhelming and he has not shown that the investigators' additional opinions affected the verdict, we must conclude that any error in the admission of that testimony was harmless beyond a reasonable doubt. *See id.* at ¶ 60-70; *Harris* at ¶ 37. *Compare State v. Green*, 9th Dist. Summit No. 29120, 2019-Ohio-4967, ¶ 27-28. Accordingly, Mr. Penn's first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR NEW TRIAL.

**{¶37}** In his second assignment of error, Mr. Penn argues that the trial court abused its discretion when it denied his motion for a new trial. We disagree.

**{¶38}** Crim.R. 33(A) allows a defendant to move for a new trial when his substantial rights have been materially affected. Grounds for a new trial include an irregularity in the

proceedings, an abuse of discretion by the trial court, and an error of law occurring at trial. Crim.R. 33(A)(1), (5). A defendant may not prevail upon a motion for new trial due to "[t]he admission * * * of any evidence offered against * * * [him], unless [he] was or may have been prejudiced thereby * * *." Crim.R. 33(E)(3). *Accord State v. Linton*, 9th Dist. Summit No. 19170, 1999 WL 771709, *4 (Sept. 29, 1999). This Court reviews a trial court's decision to deny a motion for new trial for an abuse of discretion. *State v. Pyle*, 9th Dist. Summit No. 28802, 2018-Ohio-3160, ¶ 47.

{¶39} Mr. Penn moved for a new trial based on the admission of Inspector D'Avello's testimony. He argued that the trial court should not have allowed the inspector to offer expert opinion testimony without being qualified to testify as an expert. On appeal, he maintains that the State did not lay a proper foundation for the investigator to testify as an expert. Further, he maintains that the State never provided him with an expert report, pursuant to Crim.R. 16(K), to put him on notice that the investigator would be testifying as an expert. Because an irregularity in the proceedings or an error of law occurred, Mr. Penn argues, the trial court erred when it denied his motion for a new trial.

{¶40} We have already determined that a portion of Inspector D'Avello's testimony was admissible as lay opinion testimony under Evid.R. 701 and that any error in the admission of the remainder of his testimony was harmless beyond a reasonable doubt. *See* Discussion of Assignment of Error One, *supra*. Because any error the court committed in the admission of the inspector's testimony did not affect Mr. Penn's substantial rights, we cannot conclude that it abused its discretion when it overruled his motion for a new trial. *See* Crim.R. 33(E)(3); *Linton*, 1999 WL 771709, at *4. As such, Mr. Penn's second assignment of error is overruled.

**ASSIGNMENT OF ERROR THREE**

APPELLANT'S CONVICTION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE TRIAL COURT LOST ITS WAY WHEN IT FOUND THE APPELLANT GUILTY.

{¶41} In his third assignment of error, Mr. Penn argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶42} This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). *See also Otten* at 340.

{¶43} Mr. Penn testified in his own defense at trial. He agreed that he and C.M. had a tumultuous relationship and claimed that she was both verbally and physically abusive. According to Mr. Penn, C.M. had falsely accused him of domestic violence in the past and had threatened revenge against him after he posted inappropriate pictures of her online. It was his impression that she obtained an ex parte order against him because she wanted to take some of his belongings with her when she left their house on Hampton Road. He testified that the two argued when she arrived

at the house because he discovered some of his possessions were already missing and believed she was responsible for their absence.

{¶44} Mr. Penn admitted that he asked his friend to take him to C.M.'s house after the sheriff served him with the ex parte order. He claimed that he went there because he wanted to see if any of his possessions were at the house. Mr. Penn testified that he walked around the back of the house and peered through the back, glass sliding door to look for his possessions. He denied that he had a lighter with him or that he set the fire. According to Mr. Penn, he left when he did not see his things and did not learn about the fire until later that day. He testified that C.M. smoked and that she constantly left lit cigarettes burning on dressers and other items of furniture because she did not use ashtrays. The defense theorized that the fire was either accidental, due to C.M.'s carelessness, or that she intentionally set it to frame Mr. Penn.

{¶45} Mr. Penn argues that his convictions are against the manifest weight of the evidence because much of the State's evidence against him was improper (i.e., the testimony of Inspector Hoch and Inspector D'Avello). He argues that there was no direct evidence he ever entered C.M.'s house or that he had a lighter with him when he went there. He notes that the fire department was never able to definitively determine the ignition source for the fire. Further, he notes that there was evidence C.M. routinely left unattended cigarettes burning. Because the evidence properly admitted at trial weighed heavily against his convictions, Mr. Penn argues, the jury lost its way when it found him guilty.

{¶46} Having reviewed the record, we cannot conclude that the jury lost its way when it found Mr. Penn guilty of aggravated arson and burglary. *See Otten*, 33 Ohio App.3d at 340. The jury heard testimony that Mr. Penn was angry with C.M., that he was angry about the ex parte order, that he went to her new house after being served with the ex parte order, and that the fire

was reported within ten minutes of his departure. Although Mr. Penn claimed that C.M. frequently left unattended cigarettes burning, the evidence showed that she had been away from the house for more than eight hours before the fire started. It also showed that Mr. Penn routinely carried a lighter, and that the most likely point of origin for the fire was the floor of C.M.'s dining room. The jury, therefore, reasonably could have concluded that he forced his way through the glass sliding door to start the fire rather than merely peering inside to look for possessions he claimed were missing. The jury also reasonably could have rejected his theory that C.M. intentionally set the fire, given that she was at the Hampton Road house when it started and that it destroyed more than $6,000 worth of her possessions.

{¶47} "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15 Additionally, we have repeatedly held that "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Mr. Penn has not shown that this is the exceptional case where the jury lost its way by convicting him. *See Otten*, 33 Ohio App.3d at 340. Accordingly, his third assignment of error is overruled.

**ASSIGNMENT OF ERROR FIVE**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN IMPOSING APPELLANT'S SENTENCE.

{¶48} In his fifth assignment of error, Mr. Penn argues that the trial court erred when it sentenced him to fourteen years in prison. First, he argues that his convictions should have merged as allied offenses of similar import. Second, he argues that the court abused its discretion when it

sentenced him to eight years in prison on his aggravated arson count. We consider each argument in turn.

Allied Offenses of Similar Import

{¶49} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and [Article I, Section 10,] of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. The statute provides, in relevant part:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(A), (B). The Supreme Court of Ohio has held that when a defendant's conduct supports multiple offenses, that defendant may be convicted of all offenses if "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph three of the syllabus.

{¶50} "This Court generally applies a de novo standard of review when reviewing a trial court's decision regarding the merger of convictions for the purposes of sentencing." *State v. Harris*, 9th Dist. Medina No. 16CA0054-M, 2017-Ohio-8263, ¶ 25, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. "When applying the de novo standard of review, this Court gives no deference to the trial court's legal determinations." *State v. West*, 9th Dist. Lorain No. 04CA008554, 2005-Ohio-990, ¶ 33.

{¶51} Mr. Penn's aggravated arson conviction required the State to prove that he knowingly caused physical harm to C.M.'s house by means of fire or explosion. R.C. 2909.02(A)(2). His burglary conviction required the State to prove that he forcibly trespassed in her house, when someone was likely to be present, with a purpose to commit a criminal offense. R.C. 2911.12(A)(2). It is undisputed that Mr. Penn's aggravated arson charge was the underlying criminal offense the State alleged in support of his burglary charge.

{¶52} At sentencing, the prosecutor indicated that she believed Mr. Penn's two convictions merged. She asked the court to sentence him on the aggravated arson count, but also asked for a total of sixteen years in prison in the event the court did not agree that the convictions merged. Meanwhile, Mr. Penn agreed his offenses merged. He noted that the State's theory of the case was that he committed the burglary in order to commit the aggravated arson. Because his burglary conviction depended upon his having committed arson, he asked the court to merge the two.

{¶53} The trial court determined that Mr. Penn's convictions were not subject to merger. The court reasoned:

> If you look at the past case law, burglary does not merge necessarily with the underlying offense because the purpose to commit doesn't mean you have to be successful.
>
> Once you cross the threshold of that house that does not belong to you when someone is present or likely to be present to commit any offense you've committed a burglary, and therefore the arson does not need to be committed for there to be a burglary, and, therefore, they are not offenses of similar import and do not merge. The conduct constitutes offenses of dissimilar import.
>
> The conduct shows that the offenses were committed separately and the conduct shows the offenses were committed with a separate animus.
>
> [Mr. Penn] testified [he] went in there to get [his] property back, not to commit an aggravated arson. I think there's evidence to show that they don't merge * * *.

Mr. Penn argues that the court erred when it failed to merge his convictions because they were committed in a single, continuous course of conduct, with a single animus, and the burglary was not complete until he committed aggravated arson.

{¶54} Upon review, we do not agree that the trial court erred when it refused to merge Mr. Penn's convictions as allied offenses of similar import. The general rule is that the crime of burglary is complete upon an offender's forced entry into an occupied structure. *See State v. Frazier*, 58 Ohio St.2d 253, 256 (1979). *See also State v. Evett*, 9th Dist. Medina No. 14CA0008-M, 2015-Ohio-2722, ¶ 39; *State v. Linde*, 9th Dist. Summit No. 26714, 2013-Ohio-3503, ¶ 18. This case is no exception to the general rule because Mr. Penn's burglary charge did not require him to engage in additional conduct after he broke into C.M.'s house. *Compare State v. Shears*, 1st Dist. Hamilton No. C-120212, 2013-Ohio-1196, ¶ 41 (aggravated burglary and aggravated robbery did not merge because both required, as an essential element, that the offender caused the victim physical harm). Once he entered C.M.'s house for the purpose of committing an arson, he committed the crime of burglary. *See* R.C. 2911.12(A)(2). At that point, he had the choice to leave without committing a second offense inside the home. *See Frazier* at 256. Instead of doing so, he set the fire that caused physical harm to her property. *See* R.C. 2909.02(A)(2). His offenses, therefore, were separately committed and not subject to merger. *See Evett* at ¶ 39. *See also State v. Redmyer*, 9th Dist. Medina No. 15CA0012-M, 2017-Ohio-572, ¶ 11; *State v. Fields*, 12th Dist. Clermont No. CA2014-03-025, 2015-Ohio-1345, ¶ 18. Mr. Penn's argument to the contrary lacks merit.

Maximum Sentence on Aggravated Arson

{¶55} An appellate court's standard for review of a felony sentence is not whether the sentencing court abused its discretion. R.C. 2953.08(G)(2). The Ohio Supreme Court has held

that "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1; R.C. 2953.08(G)(2). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶56} Mr. Penn argues that the trial court abused its discretion when it sentenced him to eight years in prison on his conviction for aggravated arson. He argues that he did not have any prior felonies on his record, he had a stable job, he was a contributing member of society, and he was unlikely to reoffend. Because his sentence was contrary to law and not reasonably calculated to fulfill the overriding principles of felony sentencing, Mr. Penn argues, the court abused its discretion in issuing his sentence.

{¶57} This Court may not overturn a felony sentence based on a perceived abuse of discretion. *See* R.C. 2953.08(G)(2). "[A] trial court has 'full discretion to impose a prison sentence within the statutory range' and is 'no longer required to make findings or give * * * reasons for imposing maximum * * * sentences.'" *State v. Brundage*, 9th Dist. Summit No. 29477, 2020-Ohio-653, ¶ 12, quoting *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, paragraph three of the syllabus. Trial courts must consider the statutory sentencing factors set forth in R.C. 2929.11 and 2929.12, but they need not expressly outline their considerations. *See State v. Archer*, 9th Dist. Medina No. 18CA0010-M, 2019-Ohio-171, ¶ 6. "Unless the record shows that [a] court failed to consider the factors, or that the sentence is 'strikingly inconsistent' with the factors, the court is presumed to have considered the statutory factors if the sentence is within the statutory

range." *State v. Fernandez*, 9th Dist. Medina No. 13CA0054-M, 2014-Ohio-3651, ¶ 8, quoting *State v. Boysel*, 2d Dist. Clark No. 2013-CA-78, 2014-Ohio-1272, ¶ 13.

{¶58} Upon review, the record does not support the conclusion that the trial court erred when it sentenced Mr. Penn to eight years in prison on his aggravated arson count. Mr. Penn's sentence fell within the statutory range for second degree-felonies, *see* Former R.C. 2929.14(A)(2), and, in issuing his sentence, the trial court specifically noted that it had considered the sentencing factors set forth in R.C. 2929.11 and 2929.12. The court noted that Mr. Penn had been arrested for domestic violence on numerous occasions and that he had violated temporary protection orders. It further noted that his conduct was extremely serious and damaged both C.M. and her landlord, who owned the house that was destroyed in the fire. Moreover, contrary to Mr. Penn's argument, the risk assessment conducted for his pre-sentence investigation report indicated that he was at a moderate risk of reoffending. It further indicated that he lacked remorse or accountability for his actions. Because the record supports the trial court's sentencing determination and Mr. Penn has not shown that his sentence is otherwise contrary to law, we cannot conclude that the court erred when it imposed his eight-year sentence. *See Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, at ¶ 1; R.C. 2953.08(G)(2). Mr. Penn's fifth assignment of error is overruled.

### ASSIGNMENT OF ERROR SEVEN

THE CUMULATIVE EFFECT OF ALL THE ERRORS DENIED THE APPELLANT THE RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, R.C. 2901.04, AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.

{¶59} In his seventh assignment of error, Mr. Penn argues that cumulative error deprived him of a fair trial. We disagree.

**{¶60}** Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "'[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508–509 (1983). Moreover, "errors cannot become prejudicial by sheer weight of numbers." *Hill* at 212.

**{¶61}** After reviewing the record, this Court cannot say that Mr. Penn's trial was plagued with numerous errors or that his constitutional right to a fair trial was violated. Therefore, his seventh assignment of error is overruled.

III.

**{¶62}** Mr. Penn's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, J.
CONCURS.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶63} I concur in the majority's resolution of the fourth assignment of error. As noted in the majority opinion, this Court must consider all of the evidence presented by the State when resolving a sufficiency challenge, regardless of whether the evidence was properly admitted at trial. *See State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, ¶ 19. With the aid of the testimony from Mr. Hoch and Mr. D'Avello as to the origin and cause of the fire, the State presented sufficient evidence to support Penn's convictions.

{¶64} I respectfully dissent in regard to the majority's resolution of the first assignment of error as I would conclude that the trial court abused its discretion when it permitted Mr. Hoch and Mr. D'Avello to give expert testimony at trial. I disagree with the notion that Mr. Hoch and Mr. D'Avello merely offered lay opinions about the origin and cause of the fire. Expert testimony relates to matters beyond the knowledge or experience possessed by lay persons. Evid.R. 702(A). "Unless a matter is within the comprehension of a layperson, expert testimony is necessary." *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 102 (1992). Furthermore, expert

testimony must be "based on reliable scientific, technical, or otherwise specialized information." Evid.R. 702(C). This Court has held that the cause of a fire and the origin of a fire are separate issues. *Fid. Guar. Ins. Underwriters, Inc. v. Gary Douglas Elec., Inc.*, 48 Ohio App.2d 319, 322 (9th Dist.1974). Whether an expert opinion is necessary to establish the cause and the origin of a fire is dependent upon the facts of each case. *Id*. The State often relies on expert testimony to establish the cause and origin of a fire in arson cases. *See State v. Johnson*, 8th Dist. Cuyahoga No. 106450, 2018-Ohio-3670, ¶ 44-45. While there are certainly scenarios where the cause and origin of a fire will be readily apparent to a lay witness, "[i]t has commonly been held that the cause and origin of a fire are not matters within the common knowledge of a jury and that expert testimony on these subjects should be held to be admissible." *Boardman Molded Prods., Inc. v. St. Elizabeth Hosp. Med. Ctr.*, 7th Dist. Mahoning No. 89 C.A. 8, 1990 WL 152475, *5 (Oct. 1, 1990).

{¶65} In this case, the testimony of Mr. Hoch and Mr. D'Avello went beyond rational perceptions that were rooted in their experience as fire investigators. Although neither Mr. Hoch nor Mr. D'Avello were qualified as experts, both were permitted to testify in an expert capacity regarding the origin and cause of the fire. As noted by the majority, Mr. D'Avello based his testimony on photographs because he was not able to enter the house. Mr. Hoch and Mr. D'Avello expressed definitive opinions on the origin of the fire. These opinions were largely predicated on an understanding of charring levels and burn patterns on the walls. Testimony regarding the origin of a fire based on analysis of charring levels and burn patterns observed during a visual inspection frequently falls within the purview of expert testimony. *See generally State v. Stewart*, 9th Dist. Summit No. 25857, 2012-Ohio-3671, ¶ 16; *State v. Adams*, 9th Dist. Wayne No. 07-CA-0086, 2008-Ohio-4939, ¶ 46-47.

{¶66}   As to the cause of the fire, both witnesses ruled out a number of sources during their testimony.  Mr. D'Avello testified that when eliminating ignition sources, fire investigators rely on a guideline known as the NFPA 921.  Mr. D'Avello explained that this guideline is the "holy grail" for fire investigators and that it is rooted in the scientific method.  Mr. Hoch testified that the fire originated in the dining room and was set intentionally, although without the use of an accelerant.  When Mr. D'Avello was asked why the investigators concluded that the fire was set intentionally, he testified that every possible ignition source was eliminated except an open flame.  Mr. D'Avello went so far as to opine that it was Penn who started the fire in the living room.  Mr. D'Avello indicated that this opinion was based on the totality of the circumstances, including the fact that Penn had a lighter, meaning that he had all the tools that he needed.

{¶67}   Based on the foregoing, I would conclude that the trial court abused its discretion when it permitted Mr. Hoch and Mr. D'Avello to give expert testimony regarding the origin and cause of the fire.  As this case turned on whether the evidence demonstrated that Penn entered the house and started the fire, I would conclude that the admission of the expert testimony was not harmless error.

APPEARANCES:

DANIEL R. BACHE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.